IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KIM LOUISE WHITE,

       Plaintiff,                                     CIV. S-05-0461 GGH

       vs.

JO ANNE B. BARNHART,                   ORDER
Commissioner of Social Security,

       Defendant.
_____/

       Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is denied, and the Commissioner's Motion for Summary Judgment is granted. The Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

       Plaintiff, born February 13, 1965, applied for disability benefits with a protective filing date of May 14, 2003. (Tr. at 43, 252.) Plaintiff alleged she was unable to work due to

\\\\\

\\\\\

\\\\\

1

depression, fibromyalgia, anxiety, low self esteem, poor concentration, and memory fatigue.[1] (Tr. at 52.) In a decision dated August 20, 2004, ALJ Antonio Acevedo-Torres determined that plaintiff was not disabled.[2] The ALJ made the following findings:

> 1. The claimant met the disability insured status requirements of the Act on January 1, 1999, the date the claimant stated he [sic] became unable to work, and continued to meet them through the end of December 2000.
>
> 2. The claimant has not engaged in substantial gainful activity since January 1, 1999.
>
> 3. The medical evidence establishes that the claimant has severe depression, but that she does not have an impairment or combination of impairments listed in, or medically equal

---

[1] Plaintiff first alleged she was unable to work as of June 15, 1996, but later changed the onset date to January 1, 1999, with the reason that she knew a false statement of this kind was a crime. (Tr. at 46.)

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

|   |   |   |
|---|---|---|
|   |   | to one listed in Appendix 1, Subpart P, Regulations No. 4. Her alcohol and drug abuse impairments are not severe. |
|   | 4. | The claimant's testimony is not substantially credible for the reasons stated in the body of this decision. |
|   | 5. | The claimant has the residual functional capacity to perform the nonexertional requirements of work except for understanding and completing complex job tasks. There are no exertional limitations (20 CFR 404.1545 and 416.945). |
|   | 6. | The claimant is unable to perform her past relevant work. |
|   | 7. | The claimant is 39 years old, which is defined as a younger age individual (20 CFR 404.1563 and 416.963). |
|   | 8. | The claimant possesses a high school education (20 CFR 404.1564 and 416.964). |
|   | 9. | The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work (20 CFR 404.1568 and 416.968). |
|   | 10. | If the claimant's nonexertional limitations did not significantly compromise his [sic] ability to perform work at all exertional levels, section 204.00, Appendix 2, Subpart P, Regulations No. 4 indicates that a finding of not disabled would be appropriate. If her capacity to work at all levels were significantly compromised, the remaining work which she would functionally be capable of performing would be considered in combination with her age, education, and work experience to determine whether a work adjustment could be made. |
|   | 11. | Considering the range of work at all exertional levels which the claimant is still functionally capable of performing, in combination with her age, education, and work experience, and using the above-cited section 204.00 as a framework for decisionmaking, the claimant is not disabled. |
|   | 12. | The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)). |

(Tr. at 16-17.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Consider All of Plaintiff's Impairments at Step Two of the Analysis; B. Whether the ALJ Erred in

3

Rejecting the Opinions of Plaintiff's Treating Psychiatrist and the Social Security's Consultative Examiner; C. Whether the ALJ Failed to Credit Plaintiff's Statements Regarding Her Symptoms and Functional Limitations; and D. Whether the ALJ Failed to Consider How Plaintiff's Symptoms Would Interfere with her Ability to Work on a Sustained Basis and Failed to Utilize the Expertise of a Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

ANALYSIS

A. Whether the ALJ Failed to Consider All of Plaintiff's Impairments at Step Two of the Analysis

Plaintiff first claims that although the ALJ did consider her depression at step two, he failed to consider her borderline personality disorder and probable bipolar I disorder at this step.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the

1  individual's age, education, or work experience were specifically considered." SSR 85-28. The
2  purpose of step two is to identify claimants whose medical impairment is so slight that it is
3  unlikely they would be disabled even if age, education, and experience were taken into account.
4  Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).  "The step-two inquiry is a de minimis
5  screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th
6  Cir. 1996).  At this step, the ALJ may decline to find a severe impairment "*only* if the evidence
7  establishes a slight abnormality that has no more than a minimal effect on an individual's ability
8  to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).
9  Nor does the allegation of symptoms alone, whether credible or not, suffice to establish a severe
10  impairment:

> To qualify for benefits, Ukolov must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (emphasis added); see also 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D) (emphasis added).
>
> In Social Security Ruling (SSR) 96-4p, the SSA explained what is needed under SSA regulations to show a medically determinable impairment. SSR 96- 4p, 1996 WL 374187 (July 2, 1996). [FN2 omitted] The ruling clarified that "[a]lthough the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." Id. at *1 (footnote omitted); see also 20 C.F.R. §§ 404.1508, 416.908.  The ruling noted the distinction between symptoms and signs: "symptoms ... are an individual's own perception or description of the impact of his or her physical or mental impairment(s) .... [W]hen any of these manifestations is an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, it represents a medical 'sign' rather than a 'symptom.'" SSR 96-4p, 1996 WL 374187, at *1 n. 2; see also 20 C.F.R. §§

404.1528(a)-(b), 416.928(a)-(b). The ruling then reemphasized the importance of objective medical evidence to a determination of disability:

> [R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings .... In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process.

SSR 96-4p, 1996 WL 374187, at *1-2.

Under these standards, Ukolov can only establish an impairment if the record includes signs--the results of "medically acceptable clinical diagnostic techniques," such as tests--as well as symptoms, i.e., Ukolov's representations regarding his impairment.

Ukolov v. Barnhart, 420 F.3d 1002, 1004-1005 (9th Cir. 2005).

The ALJ found only plaintiff's depression to be severe. The only diagnosis of borderline personality disorder was by consulting psychiatrist, Dr. Joyce. The ALJ acknowledged this diagnosis, but stated that Dr. Joyce found that plaintiff did "not have a mental impairment that would result in any nonexertional functional limitations." (Tr. at 14.) Dr. Joyce also diagnosed plaintiff with:

> alcohol abuse, with rule out dependence, still active. Intravenous methamphetamine abuse, reportedly in two-year remission. History of marijuana abuse, still active. History of cocaine abuse, reportedly in long-term remission. History of intravenous heroin abuse, reportedly in long-term remission. History of prescription opioid and benzodiazepine abuse, ? current activity level.

(Tr. at 163.)

\\\\\

\\\\\

\\\\\

6

Dr. Joyce additionally found plaintiff to have a GAF of 55-65.[3] He thought plaintiff could maintain attendance and performance in a work schedule, could work without distractibility, anxiety or somatic behavior, could complete a work day and week without interruption, other than substance abuse, could interact with others appropriately, ask questions and request assistance. He concluded, "other than drug abuse, this claimant appears generally capable of responding appropriately to supervision, coworkers, or the usual work situation including changes in a routine setting; of note, her AXIS II symptoms [borderline personality disorder] may be problematic in some work settings." (Tr. at 164.) The prognosis was "very guarded." (Id.)

In concluding that plaintiff could do work at all exertional levels, with only the restriction of inability to perform complex or detailed job tasks, the ALJ found that under the grids, plaintiff was not disabled. Therefore, the ALJ took Dr. Joyce's caveat into consideration when he assigned the aforementioned restriction. Furthermore, no other treating source rendered the diagnosis of borderline personality disorder. In the four years prior to the ALJ's decision that plaintiff sought regular treatment for her mental health problems, not one treating source diagnosed this condition.

In sum, according to the records, borderline personality disorder, if present at all, would not have affected plaintiff's ability to work in more than a minimal fashion.

Bipolar disorder was also not diagnosed by any practitioner. All references to this disorder were not conclusive. For example, although it was noted that Bipolar Disorder should

---

[3] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 51-60 indicates moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in functioning as in few friends or conflicts with peers or co-workers. A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV.

be ruled out in numerous notes dated August, 2001, March, 2003, June 3, 2003, July 3, 2003, July 30, 2003, August 28, 2003, September 25, 2003, November 26, 2003, April 1, 2004, April 28, 2004, June 10, 2004, and July 6, 2004, it was never actually diagnosed. (Tr. at 223,142, 143, 145, 190, 191, 192, 193, 201, 204, 206, 208, 250.)  On July 28, 2004, another treatment note stated, "bipolar disorder has been considered, but not ruled in."  (Id. at 249.)   Despite these numerous visits and treatment over a long period of time, bipolar disorder was not found, and limitations on plaintiff's functional abilities were not set due to these notations.

Plaintiff asserts that her symptoms, such as mood swings, anxiety, lability, irritability and lack of concentration were a result of these disorders which were not discussed by the ALJ.  These symptoms cannot be attributed to bipolar disorder because it was never diagnosed.  Furthermore, these symptoms could be attributed to plaintiff's diagnosable conditions, such as major depression, which was diagnosed at the same visits in which it was noted that bipolar disorder should be ruled out, and were discussed by the ALJ.  (Tr. at 190, 191, 192, 193.)[4]  Under Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001), even if plaintiff can

---

[4]

Of course, bipolar disorder encompasses depression; thus it would be somewhat misleading to characterize bipolar disorder as a disease entirely separate from depression.

> Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in a person's mood, energy, and ability to function.  Different from the normal ups and downs that everyone goes through, the symptoms of bipolar disorder are severe.  They can result in damaged relationships, poor job or school performance, and even suicide. But there is good news: bipolar disorder can be treated, and people with this illness can lead full and productive lives.
> ***
> Bipolar disorder causes dramatic mood swings—from overly "high" and/or irritable to sad and hopeless, and then back again, often with periods of normal mood in between. Severe changes in energy and behavior go along with these changes in mood. The periods of highs and lows are called **episodes** of mania and depression.

National Institutes of Mental Health, www.nimh.nih.gov/publicat/bipolar.

8

demonstrate a medically determinable impairment, she must also prove that this impairment affects her ability to perform basic work activities. Id. at 1159-60. There is no evidence in the record indicating that these conditions have an effect on plaintiff's ability to do basic work activities, and therefore they are not severe.

B. Whether the ALJ Erred in Rejecting the Opinions of Plaintiff's Treating Psychiatrist and the Social Security's Consultative Examiner

Plaintiff contends that the ALJ ignored the diagnosis of "r/o bipolar; mixed, without psychotic features" and a GAF score of 44,[5] assessed by her treating psychiatrist, Dr. Franklin,[6] and mischaracterized Dr. Joyce's statement that plaintiff's "Axis II symptoms may be problematic in some work settings."

> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician.

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).

The assessment that bipolar disorder should be ruled out has already been discussed in the previous section. Because this notation is not an actual diagnosis, and there is no diagnosis of bipolar disorder in the record, the ALJ did not err in failing to acknowledge it.

Dr. Joyce's diagnosis of borderline personality disorder, and opinion that Axis II symptoms may be problematic in some work settings, has also been discussed above.

---

[5] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 41-50 indicates: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

[6] The Commissioner states that the GAF score of 44 was assigned by an unidentifiable examiner; however, plaintiff states that it was signed by Dr. Franklin on page two of the report. (Tr. at 145-46.)

1       The GAF score of 44 was also not mentioned by the ALJ; however, this low score
2 was only found one time in the record, on April 9, 2003, around the time that plaintiff was
3 reporting intermittent suicidal thoughts. (Tr. at 152.) The treatment note at that time indicated
4 that a contributing factor was chronic methamphetamine use. (Tr. at 145.) Evidence after that
5 time indicates that plaintiff had stopped using this drug. On June 3, 2003, plaintiff reported
6 being "clean and sober." (Id. at 143.) As of July, 2003, Dr. Joyce found that plaintiff's drug
7 abuse was in remission except for marijuana and alcohol use, and that plaintiff's GAF score was
8 55-65. (Tr. at 163.) Another note from July, 2003, indicates that plaintiff reported she was
9 "clean and sober." (Id. at 208.) Plaintiff's testimony at hearing and as reported to her treating
10 practitioners was that she had been off drugs since 2001. (Id. at 261, 217.)

11      The ALJ correctly summarized the bulk of the medical evidence which indicated
12 that plaintiff's condition was much better overall than the one-time GAF score of 44 indicates.
13 He stated that her condition had improved over a two year period in which she had taken anti-
14 depressant medications and gradually recovered from substance abuse. (Tr. at 14.)

15      The records support the ALJ's summary. On June 3, 2003, plaintiff reported that
16 her medications kept her depression mild. (Id. at 143.) The medical practitioner's report states:

> On current mental status, client denies hallucinations, delusions, or paranoid ideas. Cognition appears grossly intact. She is able to express herself in a clear and organized fashion. She does not present as being grossly confused or disorganized. She is not tangential or circumstantial. She is not expansive within her conversation. Her speech is non-pressured. Rate and timbre within normal range. Her thoughts are not grossly impoverished. No ideas of reference noted or flight of ideas being exhibited. Her ability to process information appears fine. Conversation is coherent and lucid. Her concentration is fair. Attention span is fine. Tracking throughout interview is fine. She is oriented times three. Memory recent and remote appears intact. She describes her depression as being quite mild at this time. She denies feelings of wanting to harm herself or others. "In the past, I was always depressed. My thoughts were depressing. I was always thinking about suicide." At this moment, *she denies suicidal ideations or plans or homicidal ideations or plans*. Client's affect is full and variable. Mood is pleasant and cooperative.

(Tr. at 143.) (emphasis added.) This description of plaintiff is at odds with a GAF score of 44.

On July 3, 2003, plaintiff was fully compliant with medications, including Paxil, Wellbutrin and Desyrel, which were being adjusted as needed based on plaintiff's reports. (Tr. at 142.) At this time, plaintiff reported that the medications were working well except for some anger and agitation. (Id.) She was able to increase her activity and enjoyment of things she liked to do. Plaintiff no longer reported severe depression or suicidal thoughts. (Id.)

On July 30, 2003, plaintiff's medication needed adjusting as her Wellbutrin might have been causing increased anxiety; however, when it was reduced, plaintiff was more depressed. (Tr. at 208.) The adjustment of medication over time appeared to have benefitted plaintiff as evidenced by the following chart notes.

On September 25, 2003, plaintiff reported doing well on medication for depression. She had recently stopped taking pain medication to which she had been addicted for ten years. Depression remained mild at this time. (Tr. at 204.) On November 26, 2003, plaintiff was stable on medication. At this time she stated that when she forgets to take her medication, she becomes depressed very quickly, causing her to realize that the medication is working. At this time, cognition was grossly intact, conversation was coherent and logical, concentration and attention span were fair, and mood was pleasant. (Tr. at 201.) Plaintiff had no suicidal thoughts. Level of functioning was fair. (Id.)

On January 29, 2004, plaintiff reported that she was feeling better than in the last few months. At this time, plaintiff was not having suicidal thoughts but had some anxiety. (Tr. at 193.) Although feeling depressed in early April, 2004, on April 28, 2004, plaintiff reported that her mood was more calm as a result of a new prescription, Seroquel, and that she was doing much better. (Tr. at 191, 190.) Symptoms at that time included sleep difficulties, as well as anxiety and irritability. (Id.)

On June 10, 2004, plaintiff reported that she was gardening more. She did have sudden episodes of anxiety and sadness, along with periods of increased energy. (Id. at 251.)

Her mood never did drop severely, however. At this time, plaintiff's mood was elevated, thought process was linear, there were no suicidal thoughts, and judgment and insight were fair. (Id.)

On July 6, 2004, plaintiff's medication was switched from Seroquel, which had been causing pain in her mouth, to Risperdal. (Tr. at 250.)

These treatment notes indicate that plaintiff's GAF score of 44 was limited to a specific time period, and not reflective of plaintiff's condition throughout most of the record, especially the more recent history after plaintiff stopped using drugs two years prior to her hearing. The ALJ took note of this gradual improvement, and related it to plaintiff's cessation of drug and alcohol use. (Tr. at 15.)

Accordingly, the ALJ properly evaluated and characterized the medical record.

C. Whether the ALJ Failed to Credit Plaintiff's Statements Regarding Her Symptoms and Functional Limitations

Plaintiff asserts that there was nothing in the record to support the ALJ's finding that plaintiff's testimony was not credible.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication,

treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[7] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

Here, plaintiff contends that the ALJ's determination on this issue was limited to a general boilerplate statement as the sole reason for rejecting plaintiff's testimony. As a matter of fact, the ALJ's statement that her complaints were not proportional to the weight of the objective evidence was but one factor considered by the ALJ in finding that plaintiff was not substantially credible. The ALJ reviewed plaintiff's medical history in detail, and how her condition had improved over the years due to adjustment in medications and termination of alcohol and drug use. The discussion in the previous section outlines this gradual improvement.

> Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are

---

[7] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

unsupported by objective medical evidence. Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir.1991) (en banc). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.' Lester v. Chater, 81 F.3d 821, 834 (9th Cir.1995) (internal quotation marks omitted); Swenson, 876 F.2d at 687. 'General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.' Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir.1993).

Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

The only affirmative evidence of malingering in the record is plaintiff's amendment to her application for benefits, in which she changes her onset date from June 15, 1996 to January 1, 1999. (Tr. at 43, 46.) The stated reason for the change was plaintiff's awareness that making a false statement in a Social Security application constitutes a crime. (Id. at 46.) This evidence does not address plaintiff's ability to work, however, and there is no other evidence of malingering in the record.

The ALJ's stated reasons for finding plaintiff not substantially credible are nonetheless sufficient as he set forth in great detail the medical evidence that undermines her complaints. He began with her records beginning in 2000 when she was addicted to methamphetamine and alcohol, and her mental problems were found to be based on these addictions, as well as previous abuse of heroin and cocaine. (Tr. at 14.) The ALJ pointed to a 2003 report stating now that these addictions were in remission, plaintiff's mental status exam was fairly normal with no mental impairment. As plaintiff was still using alcohol and marijuana, however, her ability to work would be adversely affected. The ALJ also referenced the opinion of a nonexamining SSA psychiatrist who opined that even with this continued substance abuse, she would only be moderately impaired in her activities, social interaction and ability to concentrate. (Id.) The ALJ went on to discuss treatment records from mid to late 2003 in which plaintiff was responding well to her medications which the records indicate were adjusted over this time period. During this period, the ALJ pointed out that plaintiff "denied psychotic

symptoms, was cognitively intact, exhibited good attention, concentration, memory, insight and judgment, denied suicidal thoughts or sleep problems and was well oriented and able to communicate normally." (Id.) The ALJ referred to specific follow up visits in July, August, September, and November, 2003, in which plaintiff's depression was only mild, her demeanor was pleasant, and the overall mental exam was normal. (Id. at 14-15.) The ALJ summarized plaintiff's 2004 visits in which plaintiff was much improved, medications were stable, she was calm and without psychotic symptoms or suicidal thoughts. By July, 2004, plaintiff was working in her garden and was happy, friendly, cooperative and fully oriented. The ALJ noted that although plaintiff had a temporary recurrence of mood swings, it was due to her failure to take her medications. (Id. at 15. 249-50.) By summarizing the records in chronological order, the ALJ supported his conclusion that plaintiff's mental health condition improved over time due to treatment and medication, and recovery from substance abuse. He also demonstrated how plaintiff's mental state was directly affected by the appropriate use of medication, as demonstrated by the results when she did not take her medication.

The credibility analysis here is somewhat different than the garden variety objective symptoms versus allegations of pain. In the mental health setting, due to the subjective nature of the disease and the general lack of objective, i.e., "testing" criteria, quite often the most reliable credibility indicator of presently alleged mental symptoms are a patient's recitations to medical personnel of her own feelings over time combined with an expert's observations. Thus, the ALJ's analysis cannot be lumped into a general statement that he discounted plaintiff's allegations of mental symptoms solely because the medical record itself, in an objective sense, failed to support the "excessive" allegations. The ALJ did not err. This is not to say that the ALJ found plaintiff symptomless; of course, the record would not support such a statement. However, within the severe impairment of depression, the ALJ found plaintiff generally able to cope with her condition especially with medication. One does not have to be symptomless of all mental problems in order to be able to work.

D.  Whether the ALJ Failed to Consider How Plaintiff's Symptoms Would Interfere with her Ability to Work on a Sustained Basis and Failed to Utilize the Expertise of a Vocational Expert

Plaintiff alleges that her AXIS II diagnosis and symptoms, as well as the combined impact of her limitations, should have been considered in regard to her residual functional capacity. She additionally alleges that a vocational expert should have been used here where the evidence suggests that plaintiff's impairments may amount to a nonexertional impairment.

Plaintiff's concerns have been addressed in the previous sections. Based on the treating evidence carefully outlined above, and the opinions of the consulting physicians, also outlined previously, plaintiff's residual functional capacity was properly assessed by the ALJ. Plaintiff's AXIS II diagnosis and symptoms were already addressed in the first section. The ALJ considered them in assigning the restriction of inability to perform complex or detailed job tasks.

In regard to other symptoms alleged by plaintiff, such as mood swings, lability, fatigue, anhedonia, anxiety, irritability, agitation, diminished ability to concentrate, and need for daily naps, most of them were addressed in the first section also, and dismissed because there was no evidence to show that they impacted plaintiff's ability to do basic work activities.

In regard to plaintiff's claim that a vocational consultant should have been called, the only limitation properly found, inability to perform complex or detailed job tasks, does not preclude application of the grids.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience. At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional

capabilities.[8] Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc). The ALJ, however, is not automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional limitation. Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1996). The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional limitation significantly limits plaintiff's ability to work in a certain category. Desrosiers 846 F.2d at 578 (Pregerson, J., concurring). If so, the ALJ must use a vocational expert. Aukland v. Massanari, 257 F. 3d. 1033 (9th Cir. 2001).

As defendant points out, Social Security Ruling 85-15 requires in part that one be able "to understand, carry out, and remember simple instructions." Plaintiff contends that her impairments as outlined in this section constitute a nonexertional impairment. The only nonexertional impairment found by the ALJ and supported by the record is the inability to perform complex or detailed job tasks. Unskilled work implicitly encompasses this limitation. The court cannot find the ALJ was required to call a vocational expert. Accordingly, his use of the grids was appropriate.

CONCLUSION

The court finds the ALJ's assessment is supported by substantial evidence in the record and based on the proper legal standards.

---

[8] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989). Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

1       Accordingly, plaintiff's Motion for Summary Judgment is DENIED, the
2 Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed
3 to enter Judgment for the Commissioner.

4 DATED: 9/18/06                             /s/ Gregory G. Hollows

                                                  GREGORY G. HOLLOWS
                                                  U.S. MAGISTRATE JUDGE

GGH/076
White0461.ss.wpd